# THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION

No. 5:13-CR-61-FL-1

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) **MEMORANDUM AND** |
| | ) **RECOMMENDATION** |
| JOSE JUAN ALVAREZ-HERRERA, | ) |
| | ) |
| Defendant. | ) |

This matter comes before the court on the motion by Defendant Jose Juan Alvarez-Herrera ("Defendant") to suppress evidence seized by law enforcement officers and statements Defendant made to law enforcement officers on October 14, 2012. [DE-45]. The government filed a response in opposition to the motion [DE-48], and the undersigned held an evidentiary hearing on August 28, 2013, to further develop the record. Accordingly, this matter is ripe for review. For the reasons stated below, it is recommended that Defendant's motion to suppress be denied.

## I. PROCEDURAL BACKGROUND

On March 12, 2013, the Grand Jury charged Defendant by indictment with being an illegal alien in possession of a firearm and ammunition, aiding and abetting, in violation of 18 U.S.C. §§ 922(g)(5)(a), 924, and 2 (Count One); being an illegal alien in possession of ammunition, aiding and abetting, in violation of 18 U.S.C. §§ 922(g)(5)(a), 924, and 2 (Count Two); and illegally eluding examination or inspection by immigration officers in violation of 8 U.S.C. § 1325(a) (Count Three). [DE-1]. At the hearing, the government presented the testimony of Detective Rodney Jackson ("Detective Jackson"), Detective Spencer Elmore ("Detective Elmore"), Officer Matthew Perez ("Officer Perez"), Sergeant John Knight

("Sergeant Knight"), and Officer Jose Peralta ("Officer Peralta"), all employed with the Harnett County Sheriff's Office.[1] These officers, at various points in time on October 14, 2012, either questioned Defendant or conducted a search of Defendant's residence located at 52 O&H Lane in Harnett County. Defendant did not testify at the hearing. The government also submitted exhibits, including photographs (Gov't Exs. 4, 8 & 10-12), video and audio recordings (Gov't Exs. 2 & 6), depicting the scene of events, as well as a search warrant (Gov't Ex. 3), a law enforcement supplement reflecting Detective Jackson's notes (Gov't Ex. 14), a consent to search form (Gov't Ex. 1), and a *Miranda* waiver form (Gov't Ex. 7), all of which were admitted into evidence, without objection, for purposes of the hearing. Defendant submitted two exhibits, the same consent to search form submitted by the government (Def. Ex. 1) and a photograph (Def. Ex. 5), both admitted into evidence.

## II. STATEMENT OF THE FACTS

In total, five officers from the Harnett County Sheriff's Office testified as witnesses at the suppression hearing. The officers testified to events that occurred over the course of an almost twelve-hour time period, originating in the early morning on October 14, 2012, when a female gunshot victim was located by local law enforcement and continuing to the late afternoon when Defendant and another suspect were questioned by law enforcement officials regarding the cause of the female victim's injuries. The testifying officers participated in the events of October 14, 2012, at different times and at different locations within Harnett County and no single officer testified to the entirety of the events occurring on October 14, 2012. The facts based on their testimony are as follows.

---

[1] On October 14, 2012, Detective Elmore and Officer Perez were patrol deputies (Tr. 89, 109) and Sergeant Knight was a corporal (Tr. 150) with the Harnett County Sheriff's Office.

2

Detective Jackson of the Harnett County Sheriff's Office has worked as a detective for five years, previously serving as a deputy sheriff working on patrol. On October 14, 2012, Detective Jackson was called into work at approximately 3:00 a.m. when patrol deputies responded to a 911 call and located a Hispanic female in the Cape Fear River near a bridge in Erwin, North Carolina, who had been shot multiple times. Detective Jackson arrived at the location where deputies had retrieved the injured female from the river and was informed by deputies at the river location that the injured female had stated her name was Jessica[2] and that she had been shot by an individual named Jose Sanchez or Jose Perez.[3] Detective Jackson went to the local hospital to interview Jessica, but she had already been sedated for life flight transport to another medical facility. Next, Detective Jackson went back to his office to start identifying the injured female and other individuals involved, specifically the individual named Jose Sanchez or Jose Perez. At daylight on October 14, 2012, Detective Jackson returned to the river location where Jessica was located earlier that morning and attempted to identify the crime scene where Jessica had been shot, with the help of Detective Coats. Soon after, Detective Jackson heard over the radio that a missing person report had been made from a residence on Parkway Lane ("Parkway") in Harnett County regarding a young Hispanic female.

Detective West responded to Parkway and conducted the investigation of the missing person report as lead investigator. Detective Elmore and Officer Perez, another patrol deputy, also responded to the missing person report to provide assistance. Sergeant Knight, a corporal at the time and second in charge of the police squadron, also reported to Parkway to oversee and

---

[2]     Subsequent testimony indicates that the injured victim is Jessica Vera Rosas. Hereafter, the court will refer to the victim as Jessica.

[3]     Detective Jackson understood this name to be alternative names for one individual, not two separate individuals.

3

act as a liaison to the acting sergeant on the status of the missing person investigation. Present at the Parkway location when the officers arrived at the home were two Hispanic females, the mother of the reported missing female, Yolanda, and her other daughter, Liliana Vera Rosas ("Liliana"). Yolanda made the report that her daughter was missing when she returned home early in the morning. Yolanda did not speak English, but Liliana was able to communicate with the officers in English. However, Officer Perez, fluent in Spanish, acted as an interpreter to translate Detective West's questions and the mother's responses.

Through questioning, the officers learned that the reported missing daughter was named Jessica, that Liliana's husband was named Jose Sanchez, that Liliana lived at a residence on O&H Lane off of Overhills Road in Spring Lake in Harnett County with Jose Sanchez and another individual later identified as Defendant, that Jose Sanchez and the Defendant were back at the O&H residence asleep, that Liliana had driven a yellow van to the Parkway residence, and that Liliana had a key to the O&H residence. Upon learning this information from Liliana, Sergeant Knight asked Liliana if she would give consent for him and other law enforcement officers to enter the O&H residence. Liliana provided verbal consent and signed a "Consent to Search" form authorizing Sergeant Knight, Detective West, and all Harnett County deputies to conduct a search of the premises at the O&H residence.[4] Tr. 93; *see* Gov't Ex. 1 & Def. Ex. 1.

---

[4]    Sergeant Knight indicated that he completed the top portion of the "Consent to Search" form and witnessed execution of the form, but that Liliana and Detective West signed the form. Tr. 155. The form does not indicate an address or location to be searched in the blank provided. Sergeant Knight testified the omission of a written description of the place to be searched was an oversight on his part, but that the "Consent to Search" form pertained to the O&H residence where Liliana stated she lived because that was the only location that had been discussed between Liliana and the officers up to this time. Tr. 156-57. Further, Sergeant Knight testified that Liliana executed the "Consent to Search" form before walking out to her vehicle to retrieve her key to the O&H residence. *Id.* The court notes that Deputy Perez testified he has no recollection from October 14, 2012, about Liliana being asked for consent or giving consent for the O&H residence because he "translated a lot that day." Tr. 116-17. The court finds the testimony of Sergeant Knight to be credible and finds that Liliana gave consent to search the O&H residence and that the "Consent to Search" form relates to the O&H residence.

Case 5:13-cr-00061-FL    Document 84    Filed 10/25/13    Page 4 of 36

After execution of the "Consent to Search" form, Sergeant Knight asked Liliana to provide her key to allow Sergeant Knight to enter the residence at O&H Lane. Tr. 157, 174. Liliana exited the Parkway residence and walked out to the yellow van she was driving to retrieve her key to the O&H residence. Tr. 156-57. Sergeant Knight walked with Liliana to the van, meanwhile questioning her about the location and description of the O&H residence and the demeanor of the two individuals she claimed were asleep at the O&H residence. Liliana opened the van door to retrieve the key and gave the key to Sergeant Knight. Tr. 159. As Liliana entered the van to retrieve the key, Sergeant Knight noticed, along with Detective Elmore, a shell casing in the floorboard of the van behind the front row seating on the sliding door side. Tr. 93, 158. Sergeant Knight summoned Detective West to the van to observe the shell casing.[5] *Id.* While out at the parked van, a law enforcement officer asked Liliana if she saw anything unusual in the van. Liliana pulled out items from the van, specifically a T-shirt. Tr. 178-79. Thereafter, the van was sealed until a search warrant was obtained on the van.

Leaving Detective West at the Parkway residence, with Yolanda and Liliana, to continue the missing person investigation, Sergeant Knight, Officer Perez, and Detective Elmore drove to the O&H residence where they believed the suspects, one being Jose Sanchez, were located.[6] The officers each drove their own patrol car to the O&H residence.[7] No sirens were used in transit or once they arrived at the O&H residence. The officers parked their vehicles to the side

---

[5] Sergeant Knight stated that he did not search or look through the van other than his quick glance at the floorboard while the door was open for Liliana to retrieve her house key. Tr. 177-78.

[6] Sergeant Knight had a trainee that accompanied him to both the Parkway and O&H residences.

[7] This set of three officers were the first law enforcement to arrive at the O&H residence. Initially, there were a total of three law enforcement vehicles at the property. Tr. 95.

of the road, not directly in front of the O&H residence, and exited their vehicles.[8] Sergeant Knight, Officer Perez, and Detective Elmore each wore tactical vests and approached the residence with guns in a low ready position, held below the waist pointing downward.[9] Sergeant Knight and Detective Elmore positioned themselves on the front porch of the residence next to the front door and Officer Perez maintained his position on the ground as cover.[10] Detective Elmore knocked on the door of the residence, Jose Sanchez ("Sanchez") opened the door, and Officer Elmore announced the officers presence. All guns were in the low ready position as Sanchez opened the door. Detective Elmore asked Sanchez to show the officers his hands and to step outside the residence onto the porch. Officer Perez repeated all of Detective Elmore's commands in Spanish to Sanchez. Sanchez complied by showing his hands and stepping onto the porch. Detective Elmore testified that he holstered his gun once Sanchez stepped out onto the porch of the trailer and questioned Sanchez as to whether there were any other individuals inside the residence. Officer Perez again translated to Sanchez Detective Elmore's statements. Sanchez responded there was another individual inside, subsequently identified as Defendant. Defendant approached the doorway from inside the house and Sergeant Knight asked Defendant to come outside. Defendant made a quick movement towards the interior of the residence and

---

[8]     O&H Lane runs through a trailer park community. O&H Lane is more akin to a "driveway where the different trailers peel off." Tr. 12.

[9]     Sergeant Knight indicated that he is on the "SRT team" so he carried his subgun while the other officers carried standard sidearms. Tr. 163.

[10]     Sergeant Knight positioned himself on the porch along the side of the trailer next to the opening of the front door. Therefore, when the door opened, he was positioned to see directly inside the door jamb area.
    The court recognizes there is differing testimony indicating Officer Perez knocked on the door of the O&H residence, but finds the discrepancy immaterial to the court's discussion. Tr. 119.

Sergeant Knight grabbed Defendant's arm and again asked Defendant to step outside. Tr. 99, 122, 163.

Once both individuals were outside on the porch, Officer Perez, in Spanish, asked the two men for consent to conduct a safety sweep of the residence.[11] Tr. 122, 164. Detective Elmore, gun holstered, remained outside on the porch with Sanchez and Defendant who were not handcuffed, while Sergeant Knight and Officer Perez entered the residence and performed a cursory safety sweep. The cursory sweep lasted 45 seconds to one minute, with officers only looking in places large enough to contain a person. The officers exited the residence once it was clear.[12]

Sergeant Knight, Detective Elmore, and Officer Perez waited at the O&H residence, with Sanchez and Defendant still standing outside, for Detective Jackson to arrive. Sergeant Knight testified that all guns were holstered at this point and that his SRT, or SWAT, gear was placed back in his trunk. Sergeant Knight waited by his patrol car with Officer Perez and Detective Elmore standing in closer proximity to Sanchez and Defendant who were standing on the porch.[13] Neither Sanchez nor Defendant were handcuffed and each had use of his cell phone. Tr. 101.

Detective Jackson and Detective Coats arrived shortly thereafter at the O&H residence. Detective Jackson was contacted and notified by his Lieutenant earlier in the morning that the

---

[11]     No testifying officer affirmatively testified that Sanchez or Defendant provided verbal consent to the officers.

[12]     The only item catching the officer's attention, primarily that of Sergeant Knight, was a lit Santa Muerto candle shrine located in a bedroom closet. Sergeant Knight was unfamiliar with such shrines. Tr. 166. No evidence was seized at this time.

[13]     Detective Jackson indicated that Detective Elmore and Officer Perez were standing near their patrol vehicles when he arrived at O&H, almost 15 yards from the area of Sanchez and Defendant.

7

female gunshot victim and missing person had been identified as the same individual–Jessica Vera Rosas–and Detective Jackson was instructed to question the individuals at the O&H residence regarding their whereabouts the night previous. Sergeant Knight immediately briefed Detective Jackson on the events transpiring before his arrival, informing him that the officers had made initial contact with the individuals and conducted a consent security sweep of the residence. Detective Jackson next questioned the two individuals and first asked Sanchez to step into a shaded area about 20 yards from the front porch where Defendant was standing. Sanchez agreed and stepped over to where Detective Jackson was standing, along with Officer Perez who was helping to translate. An audio recording narrates the conversation between Detective Jackson and Sanchez. Gov't Ex. 2.[14]

When he concluded his conversation with Sanchez, Detective Jackson asked Defendant, from across the yard, if he would come to where he was standing so he could talk to him. The audio indicates laughter between Detective Jackson and Sanchez regarding Detective Jackson's need to stand in the shade to prevent his bald head from being sunburned. Gov't Ex. 2 at 19:01-19:32. Detective Jackson was standing away from the O&H residence under a tree. Defendant walked over to Detective Jackson unaccompanied by law enforcement. Detective Jackson and Officer Perez were both dressed in uniform, but neither had a gun drawn. No other officers were in the immediate area when Detective Jackson was speaking with Defendant. The same audio recording narrates the conversation between Detective Jackson and Defendant, which Officer

---

[14]     The Government's Exhibit 2, an audio recording of Detective Jackson's interviews with Sanchez and Defendant at the O&H residence, was submitted initially at the suppression hearing in an incompatible format. Upon consultation with each other, counsel agreed to submit the recording in a different format and the government did so on October 2, 2013.

    The court's specific time citations to this audio exhibit refer to the elapsed time appearing in the bottom control bar of the recording.

8

Perez translated in its entirety. Gov't Ex. 2. When Defendant reached Detective Jackson, Detective Jackson asked whether Defendant understood he was not under arrest and knew he did not have to talk with Detective Jackson if he did not want to answer any questions. *Id.* at 20:01-20:47. Defendant responded in the affirmative that he understood he was not under arrest and stated he did not have a problem speaking with Detective Jackson. *Id.* Defendant also stated he did not object to undergoing a gunshot residue test. *Id.* at 21:50-22:22. The audio recording indicates that Detective Jackson spoke with Alvarez, start to finish, for approximately five minutes. *Id.* at 19:49-24:49. Defendant returned to the porch when the conversation concluded and Sanchez and Defendant eventually reentered the O&H residence. No officers were positioned inside or at the rear of the home.

Detective Jackson returned to where the other officers were congregated and spoke with Sergeant Knight about the investigation and what, if anything, he had seen during his security sweep of the residence. Sergeant Knight described "what the overall house looked like" and indicated he saw a candle shrine in a closet. Tr. 27. Detective Jackson went back up to the O&H residence and knocked on the exterior glass door. The interior door to the residence was open. At this point, Sanchez and Defendant had re-entered the residence and were seated on the couch in the living area which could be viewed through the glass door.[15] One of the men, unidentified, said "come in" in English. Detective Jackson and Officer Perez entered the O&H residence and asked the two men if they "minded if [he] took a search of the residence or looked around the residence." Tr. 28. Detective Jackson testified that both men consented to him looking around the inside of trailer. Tr. 31.

---

[15] Detective Jackson testified that no officer was posted near the residence and the two men were permitted to move around the property and re-enter the home. Tr. 28.

9

Relying on consent, Detective Jackson and other officers began to conduct a visual search of the residence.[16] The two men remained inside the residence while officers proceeded to walk through the residence. In the bathroom, the officers noted a bleach smell appearing to emanate from a T-shirt and observed three unspent .22 caliber shell casings in the bottom of the toilet. The officers also located a box of ammunition in a book bag in another room. Upon viewing these items, Detective Jackson directed all officers to exit the residence and did a "seize and freeze" on the residence to obtain a search warrant.[17] Detective Jackson asked the two men, with the assistance of Officer Perez, if they would be willing to give a formal statement at the Harnett County Sheriff's Office. Both men agreed to do so, but indicated that they did not have transportation to get to the Sheriff's Office. Detective Jackson arranged for Detective Coats and Detective Spencer to transport the two men in their patrol cars and the two men accepted the rides. Sanchez and Defendant rode in the front seat in separate cars to the Sheriff's Office without handcuffs or any other type of restraint.

Upon arrival at the Sheriff's Office, Defendant took a seat in an interview room. Defendant's interview at the Sheriff's Office was audio and video recorded and shows

---

[16]     Detective Jackson testified that he was "doing a visual" to see if anything stood out and was not conducting a "full blown" search. Tr. 31-32. Based on Detective Jackson's testimony, it appears that Detective Coats and Officer Perez were also inside the residence assisting Detective Jackson in the search. Tr. 30-32.

[17]     Detective Toler obtained a search warrant based on Detective Jackson's probable cause statement and the O&H residence was subsequently searched. The returned search warrant includes a completed inventory list of the items seized at the residence. Gov't Ex. 3.

Defendant seated in a chair in an interview room as early as 12:35 p.m.[18] Gov't Ex. 6.[19] Defendant is seated alone in the interview room with no officers present and the door closed. The interview room contained a small table and four chairs and had, what appears to be, a glass window. The room had one door that leads in and out of the interview room. Defendant was dressed in street clothes, not under any type of physical restraint such as handcuffs or shackles, and had possession and use of his cell phone. At 12:43 p.m., a female officer entered the interview room and requested that Defendant write down his name and date of birth. For approximately 40 minutes, Defendant sat in the interview room alone before being interviewed by officers. During this time, Defendant answered a cell phone call and another woman, appearing to be an officer, brought Defendant a glass of water. Shortly thereafter, a woman entered and asked Defendant if he was "OK" and told him that officers were waiting on a translator to arrive before talking with him.

Defendant was interviewed by Detective Spencer with the assistance of Officer Peralta, a Spanish-speaking officer frequently used by the Harnett County Sheriff's Office to translate.[20] At 1:26 p.m., Detective Spencer and Officer Peralta entered the interview room and sat in chairs across the table from Defendant. Officer Peralta exchanged introductions with Defendant and

---

[18] There is no testimony indicating whether this time on the video recording accurately reflects when Defendant first arrived at the Sheriff's Office or whether Defendant was present at the Sheriff's Office for a time period before the video recording begins.

The face of the individual in the interview room is not visible on the video recording at this time. However, Officer Peralta identified this individual as Defendant. Tr. 191. Defendant later positioned himself in another chair across the table and in front of the video camera.

[19] The court's specific time citations to Government Exhibit 6 refer the time stamp in the upper left corner of the video which reflects real time recording, not the elapsed time appearing in the bottom control bar of the recording.

[20] Officer Peralta translated Detective Spencer's questions and Defendant's responses. Officer Peralta testified that his translation of Detective Spencer and Defendant was not verbatim because he would "flush out" questions and responses to facilitate the interview. Tr. 189.

11

explained that he was present to help translate. Both officers were dressed in street clothes and armed, but Officer Peralta's weapon was concealed. Per Detective Spencer's instructions, Officer Peralta immediately advised Defendant, in Spanish, that he was not under arrest and asked if he would agree to answer some questions. Defendant responded that he understood that he was not under arrest and agreed to answer some questions. The officers proceeded to question Defendant for approximately 20 minutes, with very general questions, about his living arrangements and whereabouts the evening before. The officers did not specifically mention Jessica – they simply questioned Defendant about his whereabouts. The officers next questioned Defendant about the use of his van the night before, including who, if anyone, drove the van from the residence during the previous night and if Defendant heard someone leave the house in the van. Officers told Defendant that he needed to speak up about who drove the van to keep himself out of trouble since he was the owner of the van. Gov't Ex. 6 at 1:59:53-2:00:25. Officers continued for several minutes to inquire about the van. Meanwhile Defendant's cell phone rang and officers requested that Defendant not answer, but Defendant still maintained possession of his phone. Officers next asked Defendant some questions about the last time he saw Jessica and his knowledge of what had happened to Jessica and reconfirmed his whereabouts the evening before based on his previous responses. In total, the officers spoke with Defendant for approximately 50 minutes at which point the officers indicated they needed to take a break.[21] The officers exited the interview room, leaving the door open behind them. After a few minutes, Defendant was brought a fresh cup of water. From the recording, sounds of people walking and talking can be heard in the areas surrounding the interview room.

---

[21]     Defendant did not actually confess to injuring Jessica or possessing firearms or ammunition, yet Defendant maintains his statements are at issue. Tr. 224.

12

Defendant remained in the interview room alone for approximately 20 minutes during the break. Defendant talked on his cell phone on two separate occasions during that time until Detective Spencer re-entered the room. Detective Spencer instructed Defendant to end his cell phone conversation and asked Defendant, in English, if he understood he needs to tell the truth. Detective Spencer and Defendant sat in silence for several minutes. Detective Spencer briefly exited the room and then re-entered again, this time with Officer Peralta. Detective Spencer began speaking to Defendant, in a firm voice and often pointing her pen at Defendant, and Officer Peralta began translating. Defendant was told to listen closely, that the officers want the truth and will get it from either Defendant or Sanchez first, that Jessica told the officers what happened and they know, and that if Defendant waits to tell the truth they will "go hard" after Defendant. Gov't Ex. 6 at 2:44:08-2:46:25. Officers continued to insist that Defendant tell the truth about what happened to Jessica and insisted that Defendant knows the truth. Defendant asked if he would get arrested and what type of help he would receive and the officers responded that it depended on the truth. *Id.* at 2:48:50. Defendant maintained he told the officers the truth regarding his whereabouts.[22]

This discussion between Defendant and the officers continued for approximately 10 minutes at which point Detective Spencer instructed Officer Peralta to read Defendant his *Miranda* rights.[23] Officer Peralta read Defendant his *Miranda* rights in Spanish. Defendant indicated he wanted to tell the truth and he signed a *Miranda* waiver form immediately after

---

[22]     Defendant previously told the officers that he went to Food Lion the evening before to buy beer, then came home and drank beer until he went to sleep at approximately 9:30 p.m. Defendant stated he never left the O&H residence and was asleep the entire night. Gov't Ex. 6 at 1:30:48-1:55:55.

[23]     Specifically, Detective Spencer pointed to a book that Officer Peralta had sitting in front of him on the table and instructed him to read from it. Officer Peralta testified that the book contained a *Miranda* warning in Spanish.

13

being read his *Miranda* rights by Officer Peralta. Gov't Ex. 6 at 2:55:51-2:56:16. Defendant did not request a lawyer or did not indicate he wished to stop talking with the officers. The officers continued talking with Defendant in the interview room for approximately one hour, with Detective Spencer briefly exiting the room. Ultimately, at 4:28 p.m., Defendant was informed that he was being charged and arrested for the injuries sustained by Jessica. Defendant was handcuffed at the Sheriff's Office on October 14, 2012 at 4:37 p.m.

## III. DISCUSSION

### A.    Search of the van at Parkway Lane

Defendant first argues the law enforcement officers violated the rights guaranteed him by the Fourth Amendment by recruiting a private citizen, Liliana Vera Rosas, to perform a search of his van. Tr. 219-220. This particular argument was not raised by Defendant in his motion to suppress, Def.'s Mem. [DE-45], but raised for the first time at the suppression hearing held by the court. The government challenged the propriety of Defendant raising an argument as to the van for the first time at the suppression hearing. The government has not had an opportunity to respond to Defendant's argument other than at the suppression hearing where it contended that Liliana's actions did not constitute a private search protected by the Fourth Amendment. This court finds Defendant's argument without merit.

The protection afforded by the Fourth Amendment does not apply to a search conducted by a private individual unless that individual is acting as an agent of the government or with the participation or knowledge of a governmental official. *See United States v. Jarrett*, 338 F.3d 339, 344 (4th Cir. 2003); *see also United States v. Jacobson*, 466 U.S. 109, 113 (1984) (holding that the Fourth Amendment is "wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with

14

participation or knowledge of any governmental official"); *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971). It is axiomatic that the government cannot act through a private individual in a way that is otherwise forbidden by law. *See United States v. Feffer*, 831 F.2d 734, 737 (7th Cir. 1987). Thus, any evidence secured by private searches, even if illegal, need not be excluded from a criminal trial. *Jarrett*, 338 F.3d at 344 (citing *Walter v. United States*, 447 U.S. 649, 656 (1980)). The question here, therefore, is whether Liliana was acting as a private citizen or an "'instrument' or agent of the state" in retrieving the T-shirt from the van and handing it over to law enforcement officers. *Coolidge*, 403 U.S. at 487. The defendant bears the burden of proving that a private party acted as an agent or instrument of the government. *See United States v. Reed*, 15 F.3d 928, 931 (9th Cir. 1994).

Determining whether the "requisite agency relationship exists 'necessarily turns on the degree of the Government's participation in the private party's activities, . . . a question that can only be resolved in light of all the circumstances.'" *Jarrett*, 338 F.3d at 344 (quoting *Skinner v. Ry. Labor Execs. Ass'n*, 489 U.S. 602, 614-15 (1989)). The Fourth Circuit follows a two-pronged approach in determining whether a search conducted by a private actor constitutes a government search triggering Fourth Amendment protections. The two factors considered are: (1) whether the government knew of and acquiesced in the private search; and (2) whether the private individual intended to assist law enforcement or had some other independent motivation. *Id.* In considering the first factor, courts have generally required "evidence of more than mere knowledge and passive acquiescence by the Government before finding an agency relationship." *Id.* (citing *United States v. Ellyson*, 326 F.3d 522, 527 (4th Cir. 2003)); *see also United States v. Smythe*, 84 F.3d 1240, 1242-43 (10th Cir. 1996) ("[K]nowledge and acquiescence . . . encompass the requirement that the government must also affirmatively encourage, initiate or instigate the

15

private action.") (citation omitted); *United States v. Koenig*, 856 F.2d 843, 850 (7th Cir. 1988) ("It is only by the exercise of some form of control that the actions of one may be attributed to another. Mere knowledge of another's independent action does not produce vicarious responsibility absent some manifestation of consent and the ability to control.") (citations omitted). For instance, while the government's "knowledge of the private person's conduct obviously is critical, it is not enough, standing alone, to establish the requisite agency." *United States v. Moss*, No. 94-5757, 1996 WL 389484, at *3 (4th Cir. July 12, 1996). Additionally, the "failure of government actors to prevent a private person from conducting a search that they could not themselves conduct lawfully, does not, standing alone, make the private person's conduct that of the Government." *Id.*

Defendant's argument is based on Sergeant Knight's testimony on cross-examination that an officer at Parkway asked Liliana whether she "saw anything unusual in the [van]."[24] Tr. 178. Following the officer's question, Liliana proceeded to pull other items out of the van, including a T-shirt.[25] Tr. 179. Defendant contends that law enforcement's question to Liliana establishes that the subsequent action by Liliana to enter the van and remove the T-shirt from the van constituted government action. Tr. 219. Specifically, Defendant contends that this questioning by law enforcement officials demonstrates Liliana was acting under the direction of law enforcement when she removed the T-shirt from the van because the questioning prompted her to do so. *Id.*

---

[24] Sergeant Knight denied that he asked Liliana this question, but testified that he recalled the question being asked by another officer. Tr. 179.

[25] At this time, Liliana had already entered the van to retrieve the key to the O&H residence and Officer Knight had observed the shell casing on the floorboard of the van.

16

Assuming that Liliana conducted a search within the meaning of the Fourth Amendment, this court concludes that Liliana's actions did not equate to government conduct triggering constitutional protections. The law enforcement official's conduct in questioning Liliana about the contents of the van is "close to the line" in evidencing instigation on the part of law enforcement, however, it does not establish the requisite level of knowledge and acquiescence sufficient to make Liliana a government agent. First, law enforcement officers asked Liliana a question – they did not direct her to retrieve items from the van. While Liliana may not have pulled the T-shirt out otherwise, the decision to do so was entirely Liliana's decision and not in response to a directive from law enforcement. Liliana could have verbally responded to the question without entering the van, demonstrating the question did not necessarily prompt her to begin rummaging through the van. *See Smythe*, 84 F.3d at 1243 (noting that the Fourth Amendment is not implicated "when a private person voluntarily turns over property belonging to another and the government's direct or indirect participation is nonexistent or minor").

Also, the law enforcement officers did not touch or handle the van or items inside the van and did not assist Liliana as she entered the van and retrieved the shirt. *See United States v. Benoit*, 713 F.3d 1, 10 (10th Cir. 2013) (noting that the officer "did not touch or handle the computer or any of its parts, and did not assist or encourage [the private individual] as she opened the [computer] file"). Here, Liliana retained full control over her actions and full control over the van while law enforcement officers passively stood in the area near or around the van. It has been indicated that Liliana spoke English and was able to communicate with the officers in English, supporting the fact that her actions with respect to the van were voluntary and not at the direction of law enforcement officers. Liliana went to the van voluntarily to retrieve her house key after consenting to a search of her residence. Additionally, the fact that law enforcement

17

officers did not actively discourage Liliana from entering the van to retrieve items does not automatically transform Liliana into a government agent. *See Jarrett*, 338 F.3d at 347 (recognizing the government is under "no special obligation to affirmatively discourage" certain behavior by private citizens). Defendant has presented no other evidence in support of his contention. Therefore, this singular question by law enforcement, without more, does not transform an otherwise private search into a government intrusion.

In sum, Liliana was not a government actor when she retrieved the T-shirt from the van. Accordingly, the court recommends that Defendant's motion to suppress be denied on this basis.

**B. Searches of the O&H residence**

Defendant contests two warrantless searches performed by law enforcement at the O&H residence: (1) the initial sweep conducted by the law enforcement officers upon arrival at the O&H residence and (2) the second search by Detective Jackson whereby items served as the basis for the search warrant later obtained for the O&H residence.[26] Def.'s Mem. at 2, 4; Tr. 222. Specifically, Defendant argues that law enforcement officers searched "without obtaining proper consent." Def.'s Mem. at 2. The government argues that both searches were lawful based on lawful consent given by the occupants. Gov't Resp. [DE-48] at 7; Tr. 228. Additionally, the government argues that the initial search was lawful under the protective sweep exception to the warrant requirement. Tr. 228.

It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is "per se unreasonable . . . subject only to a few

---

[26] In the initial briefing in this case, Defendant appears to only contest the second search performed by Detective Jackson at the O&H residence. However, in closing argument at the suppression hearing, Defendant contested the initial search performed when officers arrived on the premises. The court addresses both searches.

18

specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). A search conducted pursuant to valid consent is a well-recognized exception to the Fourth Amendment's general warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *Trulock v. Freeh*, 275 F.3d 391, 401 (4th Cir. 2001). Consent to search is valid if it is (1) knowing and voluntary and (2) given by one with authority to consent. *United States v. Buckner*, 473 F.3d 551, 553 (4th Cir. 2007). The government bears the burden of establishing, by preponderance of the evidence, that it obtained valid consent to search. *Id.* at 554. The court looks first to whether the defendant's words or conduct could reasonably be interpreted as providing consent, and second to whether the defendant's consent was voluntary. *See United States v. Scott*, No. 1:10-CR-348, 2010 WL 5067906, at *4 (M.D.N.C. Dec. 6, 2010).

When an individual gives consent to search, he "may impose limits on the items or areas subject to the . . . search, just as he may refuse to allow any search whatsoever in the absence of a warrant." *United States v. Jones*, 356 F.3d 529, 534 (4th Cir. 2004). While an individual may also give general and unqualified consent to search a given area, this "by itself, would not likely permit officers to *break into* a locked container located within the area being searched." *Id.* (emphasis in original). The question of what an individual's consent permits officers to do is governed by the an "objectively reasonable" standard. *See United States v. Neely*, 564 F.3d 346, 350 (4th Cir. 2009). Thus, the question for the court in determining the extent or limits of a person's consent is "what would the typical reasonable person have understood by the exchange between the officer and the [consenting individual]?" *Id.* (citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)).

Whether a defendant's consent to search is voluntary is a factual question. *Schneckloth*, 412 U.S. at 248-49. The voluntariness of consent is measured under the totality of the

19

circumstances, considering the defendant's characteristics such as age, maturity, education, and experience and the conditions under which the consent to search was given, including the officer's conduct. *See United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996). Courts also may consider whether the individual giving consent knew that he possessed a right to refuse consent in determining the voluntariness of consent, although the government need not demonstrate the person knew of his right to refuse to prove that consent was voluntary. *Id.*; *United States v. Boone*, 245 F.3d 352, 362 (4th Cir. 2001). Additionally, the Fourth Circuit has held that a consenting person need not give explicit and express consent to search for a reasonable officer to understand that valid consent was given. *See United States v. Hylton*, 349 F.3d 781, 785 (4th Cir. 2003) (holding that consent may be inferred from actions as well as words); *see also United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981) ("[A] search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.'")

In the case of shared residences, the defendant is not the only person with authority to consent to a search of his residence – a third party with common authority over the premises may provide permission to search. *United States v. Matlock*, 415 U.S. 164, 171 (1974); *see also Trulock*, 275 F.3d at 401. Authority to consent arises from mutual use of the property by those with joint access or control, so that a co-occupant would recognize the risk that another might allow a common area to be searched. *Trulock*, 275 F.3d at 403. A co-occupant of a house may give valid consent to search even if other co-occupants have not given consent. *Hylton*, 349 F.3d at 785. However, if one co-occupant consents to a search while another is physically present and objecting, law enforcement officers do not have reasonable grounds to believe that they can

20

search the premises. *Georgia v. Randolph*, 547 U.S. 103, 107 (2006) (husband at door refusing to consent, while wife at door consenting to search).

> ### i. *Initial sweep performed by Sergeant Knight and Officer Perez*[27]

Here, the court finds the initial entry into the O&H residence by Sergeant Knight and Officer Perez, to perform a cursory sweep, was lawful based on the valid consent provided by Liliana to the officers at Parkway earlier in the day on October 14, 2012.[28] The fact of Liliana's consent is established primarily by the testimony of various officers speaking with her at Parkway and the "Consent to Search" form signed by Liliana. Gov't Ex. 1 & Def. Ex. 1. Detective Elmore testified that Liliana gave verbal consent for the officers to enter the residence when asked by Sergeant Knight if he and other officers could proceed inside the O&H residence.[29] The testimony of Sergeant Knight also supports the fact that Liliana consented verbally after being asked, though his testimony is less clear than Detective Elmore's on this issue. The combined testimony of these two officers supports the existence of Liliana's verbal consent. Further, Liliana's consent is confirmed by the consent form she signed. Evidence submitted at the hearing includes a "Consent to Search" form from the Harnett County Sheriff's Office bearing Liliana's signature. *Id.* Sergeant Knight and Detective Elmore witnessed the

---

[27] This issue was not briefed by the parties. The court is not aware and the government has not advised the court as to how the initial search is valid as a protective sweep. Accordingly, the court only addresses the issue of consent in regard to this search because the law governing protective sweeps appears inapplicable to the circumstances in this case.

[28] Testimony from Detective Elmore, Sergeant Knight, and Officer Perez indicates that the officers asked Sanchez and Defendant for consent to enter the home to perform a cursory sweep and subsequently did enter the home to perform a cursory sweep for approximately 45 seconds to one minute. Therefore, it appears that consent was likely given by the two men because no officer testified to either individual objecting; however, there is no testimony evidencing the existence of express or implied consent by Sanchez or Defendant. Here, because Liliana gave valid consent which the officers could rely on to enter the premises at the relevant time, the court need not speculate as to consent given by Sanchez or Defendant.

[29] Detective Elmore testified that Liliana "advised that we could [go inside the residence]." Tr. 93.

execution of the form and indicated that the signature on the form belongs to Liliana. Tr. 92, 154-56. Although the consent form does not expressly state that it relates to the O&H residence, the context in which it was signed establishes that it, in fact, relates to the O&H residence. Sergeant Knight testified on direct examination that the consent form related to the O&H residence, and not the van, because the O&H residence was the only topic that had been discussed with Liliana at the time she signed the consent form. Tr. 157. He also testified that the failure to list the O&H residence on the blank lines requesting a description of the premises to be searched was the result of his oversight and there is no indication that the consent form referred to Parkway which is not Liliana's residence. Because the court finds Sergeant Knight's testimony credible, it finds that he is credible regarding the consent form signed by Liliana. Defendant failed to present evidence to refute that the consent form did not relate to the O&H residence. Finally, there is no indication from the hearing testimony that Liliana's consent was anything but knowing and voluntary. Liliana was able to communicate with the officers in English, she was not a suspect, and there is no evidence of an oppressive or threatening police presence at Parkway.

Of further importance is the fact that Liliana had authority, as a co-occupant of the O&H residence, to consent to the officers entering the home. *See Matlock*, 415 U.S. at 171. The officers knew that Liliana was a resident of the trailer by her own statements that she resided at the O&H residence and her possession of a key to the residence. It was reasonable for officers to believe she had authority to consent to a search of the premises, even though they obtained her consent while she was present at Parkway where her mother lived. There is no credible evidence that Liliana ever represented that she lacked authority. In making this finding, the court rejects Defendant's argument that the officers could not have reasonably deemed her to have authority

Case 5:13-cr-00061-FL   Document 84   Filed 10/25/13   Page 22 of 36

to consent. Tr. 223. Also, there is no indication that Sanchez or Defendant, both physically present at the residence, objected to the officer's entering the residence. *See Randolph*, 547 U.S. at 106 (noting that an officer may not proceed on one co-tenants consent when another co-tenant is physically present and objecting).

Defendant also contends, in closing argument, that Liliana limited her consent to "getting a hold of these two individuals" and that once both Sanchez and Defendant exited the O&H residence onto the porch, Liliana's consent was exhausted. In other words, Defendant contends that Liliana's consent only permitted the officers to enter the O&H residence to locate Sanchez and Defendant and it was not an unqualified consent to search. Tr. 222. Defendant relies on Detective Elmore's testimony which states as follows

> Q: Okay. And did you take any further action while you were there responding to the missing persons call?
>
> A: While at the residence, as I said, we learned where the suspects were located. And I believe it was [Sergeant] Knight asked if we could – if she would give consent for us to go to the residence if we were unable to get anybody to the door, if we could have her consent to go inside the residence. She advised that we could. She signed a consent form. She went to go get her keys to her residence so *if nobody came to the door that we could go in.*

Tr. 92-93 (emphasis added).

The court does not find that Liliana's consent was limited to locating Sanchez and Defendant and otherwise did not permit the officers to enter the residence. First, Detective Elmore's cited testimony, as relied on by Defendant, is not responsive to a question about the scope of Liliana's consent for officers to search the O&H residence. Therefore, the court does not find this line of testimony persuasive to establish that Liliana's consent was limited to locating the two men. Second, Sergeant Knight was the officer who requested Liliana's consent

23

to enter the O&H residence and participated in the completion and execution of the consent form signed by Liliana. Due to Sergeant Knight's more intimate involvement in obtaining Liliana's consent, the court finds his testimony most credible on this issue. The court finds from his testimony that a reasonable officer would have understood Liliana to be giving unqualified consent to enter and search the O&H premises. Sergeant Knight's testimony does not indicate Liliana imposed limits on her consent and his testimony concerning the exchange between himself and Liliana supports this finding.[30] The consent form itself allows, without qualification, officers "to conduct a complete search of the premises." Gov't Ex. 1 & Def. Ex. 1. Further, the parties have not contested whether the officers' search included non-common areas beyond Liliana's authority to consent and the court's own review does not indicate that the officers search included areas not reasonably considered within Liliana's common authority. Accordingly, the court recommends Defendant's motion to suppress be denied as to the initial search.

### ii.     Second Search performed by Detective Jackson

The court now turns its analysis to the issue of whether the second search of the O&H residence conducted by Detective Jackson was lawful pursuant to valid consent. Defendant contends that Detective Jackson did not obtain *proper* consent from Defendant. Def.'s Mem. at 2, 4. In contending the consent was not knowing or voluntary, Defendant argues that there was a

---

[30]     Sergeant Knight referenced Liliana's consent in the following manner: (1) "[I]t was asked of her would she sign a consent form for us to go inside the residence, would she agree," Tr. 153:12-14; (2) referring to the consent form, "[t]he very top part here is the individual who consented to this search, which was Liliana," Tr. 155:17-18; (3) again referring to the consent form, "I did not put the address of the residence to be searched," Tr. 156:13-14; (4) "She said she needed to retrieve the key to the residence where the individuals were. I had told her . . . I wanted some kind of writing . . . that gives me access to that residence," Tr. 157:14-18; and (5) "I did not want to go over there without something in my hand from somebody who lived there that gives me access to that residence," Tr. 158:10-12. These statements support a more general consent to enter the premises.

24

language barrier interfering with his comprehension and that the environment was coercive. *See* Def.'s Mem. at 3-4; Tr. 223-24. Therefore, Defendant appears to concede that he gave consent, but contests the consent being knowing and voluntary. The hearing testimony likewise supports that Sanchez and Defendant gave verbal consent when Detective Jackson requested to search the residence. Tr. 28- 31. Since consent was given by Defendant, the court focuses solely on the validity of Defendant's consent.

After weighing the evidence and considering the "totality of the circumstances" standard by which consent is measured, the court finds that Defendant's consent to search the O&H residence was voluntary. The language barrier does not persuade this court to accept Defendant's argument that consent was not valid. Detective Jackson requested consent to search in Defendant's native language, through the use of Officer Perez who is a native Spanish speaker. Detective Jackson sought consent in Spanish knowing that Defendant would better understand the request for consent once translated to him. Defendant gave his verbal consent after it was asked for in his native language. *See United States v. Martinez-Turcio*, 494 F. App'x 354, 364 (4th Cir. Sept. 17, 2012) (rejecting defendant's argument, in part, that the environment was coercive because he was spoken to in his native language). Further, the evidence indicates that the two men were permitted to move about the residence freely, were permitted to speak with each other and make calls on their cell phones, and officers were not covering the entry and exit to the residence. Moreover, all officer firearms had been holstered from the time the two men initially exited the residence, at least a half hour or more before, and no other officers drew their weapon while at the residence. *See United States v. Elie*, 111 F.3d 1135, 1145-46 (4th Cir. 1997) ("Neither the drawing of a gun by an arresting officer, nor the handcuffing of the accused establishes involuntariness in and of itself."). Both Defendant and Sanchez had been briefly

25

questioned by Detective Jackson and advised during that time that they were not under arrest and had the choice to refuse to speak with the officers. Also, only Detective Jackson and Officer Perez entered the residence to request consent to search while all other officers were outside either beside or inside their patrol cars. Additionally, there were no false or misleading statements made by the officers to suggest that Defendant could not refuse consent and Defendant and Sanchez had been compliant with other officer requests while at the residence. Given these facts, Defendant's consent was knowing and voluntary. There is no evidence indicating that this consent did not permit the officers to proceed to search the inside of the trailer. Accordingly, the court recommends that Defendant's motion to suppress be denied as to the search performed by Detective Jackson.[31]

## C. Defendant's Statements[32]

Defendant contends that he was subjected to custodial interrogation without *Miranda* warnings on October 14, 2012, both at the O&H residence and at the Harnett County Sheriff's Office. Defendant argues the circumstances indicate he was in custody from the time the officers arrived at the O&H residence that morning and that the officer's failure to advise him of his *Miranda* rights renders his statements inadmissible. Tr. 226. Defendant also argues that his *Miranda* waiver was not knowing and voluntary because of the language barrier and that all statements made subsequent to *Miranda* must be suppressed. Specifically, Defendant maintains that any waiver was not knowing and voluntary because the waiver form Defendant signed was

---

[31] Because this search was lawful given valid consent, any argument as to the validity of the search warrant based on the impropriety of this search is moot.

[32] The evidence does not indicate, and Defendant does not specify, what particular statements are contested. Moreover, Defendant does not appear to have made incriminating statements prior to being *Mirandized*. Defendant nonetheless generally contests any statements made by Defendant before a *Miranda* warning was given because "it could be incriminating that [Defendant] indicated otherwise earlier on." Tr. 224.

26

in English. Def.'s Mem. at 6. The government responds that Defendant's waiver was knowing. Gov't Resp. at 10.

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To protect this right, the Supreme Court adopted in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), several procedural rules that law enforcement must follow during custodial interrogations. Any statement elicited from a defendant in violation of these rules is not admissible in the prosecution's case-in-chief. *Oregon v. Elstad*, 470 U.S. 298, 307 (1985). However, the protections of *Miranda* only apply to custodial interrogations, that is, interrogations conducted after a suspect has been formally arrested or "where there has been such restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). The parties do not appear to dispute that the officer's interview with Defendant at the O&H residence and at the Sheriff's Office constituted interrogation. *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) ("[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response."). Therefore, the only dispute is whether Defendant was in custody at any point during questioning. If not, then no *Miranda* warning was required. *United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2001).

An individual is in custody for *Miranda* purposes when he is formally arrested or his "freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (internal quotations omitted). The custody inquiry is objective: the question is not whether the suspect or the interrogating officer believes that the suspect was in custody, but whether a reasonable person in the suspect's position would have understood that he

27

or she was in custody. *Id.* at 442. Since the determination of whether an individual is in custody is a fact-intensive inquiry, this determination must be made on a case-by-case basis based on the "totality of the circumstances." *United States v. Jones*, 818 F.2d 1119, 1123-24 (4th Cir. 1987). A court must examine all of the circumstances surrounding the interrogation and determine whether a reasonable person would have felt he was "not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Case law suggests that there are numerous factors to be considered by courts in making a custody determination, including, but not limited to: (1) whether the defendant was informed that he was not under arrest and that he was free to terminate the questioning; (2) whether the defendant possessed unrestrained freedom of movement during questioning; (3) whether the defendant voluntarily submitted to questioning; (4) whether the agents employed strong arm tactics or deceptive stratagems during questioning; (5) whether the atmosphere of questioning was police-dominated; (6) whether the defendant was placed under arrest after termination of the questioning. *See United States v. Jefferson*, 562 F. Supp. 2d 707, 713-14 (E.D. Va. 2008) (reciting factors considered by courts in assessing the "in custody" determination).

A defendant may waive any of the rights conveyed in the *Miranda* warning provided the waiver is made knowingly and voluntarily. For a waiver to be knowing and intelligent, it "must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). As the Fourth Circuit has explained, "[t]he determination of whether a waiver was knowing and intelligent requires an examination of the totality of the circumstances surrounding the interrogation, including the suspect's intelligence and education, age and familiarity with the criminal justice system, and the proximity of the waiver to the giving of the *Miranda* warnings."

28

*Correll v. Thompson*, 63 F.3d 1279, 1288 (4th Cir. 1995). A waiver is voluntary if it was "'the product of a free and deliberate choice rather than intimidation, coercion, or deception' on the part of the police." *Poyner v. Murray*, 964 F.2d 1404, 1413 (4th Cir. 1992).

### i. *Interview at the O&H residence*

After examining the totality of the circumstances in this case, the court finds that a reasonable person in Defendant's position would have felt that he was not in custody and was free to leave at any time. At the O&H residence, Detective Jackson invited Defendant to speak with him there at the home. Defendant voluntarily agreed to speak with Detective Jackson and walked over to his location in the yard. *See Parker*, 262 F.3d at 419 (recognizing that the fact that suspect was interviewed in her own home mitigated against a finding that she was in custody). The audio recordings indicate there was some laughter between Detective Jackson and Sanchez as Defendant was walking over to Detective Jackson, not indicative of a custodial environment. Gov't Ex. 2 at 19:01-19:32. This initial questioning took place in the yard of the residence under a tree. Only Detective Jackson and Officer Perez, the translating officer, were in the vicinity with Defendant at this time. There were approximately six officers present on the premises when Defendant was interviewed by Detective Jackson. However, the other officers were positioned on the perimeter of the premises either beside or inside their patrol car and not in close proximity to Defendant. *Cf. United States v. Colonna*, 511 F.3d 431, 436 (4th Cir. 2007) (stating that the atmosphere was police-dominated where 23 FBI agents entered the house, woke suspect at gunpoint, and guarded suspect at all times). Therefore, Defendant's contact with officers was fairly limited, only speaking with Detective Jackson and Officer Perez. While officers were armed, no weapons were drawn. In fact, only the three officers who made initial contact with Sanchez and Defendant ever drew weapons and those officers maintained their

29

weapons in the ready position, never pointing them directly at the two men. Those officers immediately holstered their weapons once the two men exited the residence. Defendant was not handcuffed or otherwise restrained in his movement around the property. The evidence indicates that there were no officers specifically assigned to guard the movements of Sanchez and Defendant and Defendant was not touched in a physically threatening manner. Defendant had his cell phone and was permitted to use it. Also, Defendant observed Detective Jackson interview Sanchez first and saw Sanchez freely walk back to the house when it concluded.

Additionally, Defendant was spoken to in his native language through the use of Officer Perez. When Defendant first approached Detective Jackson in the yard, Defendant was advised that he was not under arrest and that he could refuse to speak with the officers. The audio recordings from this interview confirm that Defendant was advised of these two matters before Detective Jackson ever questioned Defendant and Defendant affirmatively responded that he did not have a problem speaking with the officers. Gov't Ex. 2 at 20:00-21:00. Detective Jackson did not threaten Defendant or use deceptive tactics. Detective Jackson's tone of voice remained steady and calm, carrying an indifferent tone throughout questioning, and the nature of his questions were more exploratory than accusatory. *Id.* at 19:49-23:26. Detective Jackson never stated that Defendant was being questioned as a suspect. *Id.* Detective Jackson thanked Defendant at the end of his questioning, which lasted no more than five minutes in total, and allowed Defendant to walk back towards the residence. *See United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir. 1987) (finding custody where agents repeatedly accused suspect of lying and employed coercive and misleading tactics). Even if Detective Jackson's purpose in interviewing Defendant was to learn about what happened to Jessica, this does not persuade the court that a reasonable person would have felt he or she was in custody.

30

Based on the sum of these facts and application of the factors commonly considered by courts in making a custody determination, the court finds Defendant was not in custody during his interview at the O&H residence. Accordingly, this court recommends Defendant's motion to suppress be denied as to any adverse statements made at the O&H residence.

      *ii.*     *Interview at the Harnett County Sheriff's Office*

Defendant contends that he continued to be in custody while transported to the Sheriff's Office and for the entire duration he was at the Sheriff's Office on October 14, 2012. Defendant also contends that his *Miranda* waiver during the interview was not knowing or voluntary. Def.'s Mem. at 6. The government responds that Defendant was not in custody at the Sheriff's Office prior to a *Miranda* warning being given, and that at the time *Miranda* was given, Defendant made a knowing and voluntary waiver. Gov't Resp. at 9-10.

Based on a review of the record, the court finds that there were two separate interrogations that occurred at the Sheriff's Office, both taking place in the same interview room, but separated in time by a break in the questioning of approximately 20 minutes.[33] As for the first interrogation before the break, the court finds that the totality of the circumstances indicate Defendant was not in custody at the Sheriff's Office for purposes of *Miranda*. While Defendant was interviewed at the Sheriff's Office in an interview room as opposed to a more casual environment, the other factual circumstances do not indicate that Defendant was in custody at this time. *See United States v. Howard*, 115 F.3d 1151, 1154 (4th Cir. 1997) (noting that the fact that questioning takes place at a police station is not dispositive of whether individual is in

---

[33]     After approximately 50 minutes of generally questioning Defendant about his whereabouts the night before, both officers exited the room upon Detective Spencer indicating she needed a break. Defendant remained in the interview room alone, with the door open, and Defendant took two phone calls while the officers were gone. The officers returned approximately 20 minutes later. Gov't Ex. 6 at 2:18:33-2:40:40.

custody). Beginning back at the O&H residence, Defendant and Sanchez were invited by Detective Jackson, through Officer Perez, to go to the Sheriff's Office to give a formal statement. The two men indicated they would be willing to go to the Sheriff's Office and went voluntarily. Detective Jackson arranged transportation for the two men with two other detectives since they indicated they did not have transportation to get there. Defendant rode in the front seat of one of the patrol cars to the Sheriff's Office. Defendant was not handcuffed or restrained during the ride and was not restrained upon his arrival at the Sheriff's Office or at any relevant time. Upon arriving at the Sheriff's Office, Defendant was seated in an interview room and waited there alone for approximately 50 minutes before Detective Spencer and Officer Peralta entered the interview room to begin questioning. No officer was guarding Defendant during this time and several officers checked in to ask him if he would like some water and if he was doing "ok." Defendant was told that officers were waiting to question him because they were waiting for a translator to arrive, dispelling the argument that a reasonable person would have felt in custody based on the wait time that elapsed.

During questioning, Detective Spencer and Officer Peralta were not hostile to Defendant. The circumstances at the Sheriff's Office were straightforward and businesslike. Both officers remained seated across the table from Defendant. Officer Peralta spoke primarily with Defendant, conversing in Spanish, and the conversation was calm and conducted without any yelling, bullying, profanity, or physical pressure. Defendant freely answered the officers questions. The officers discussed with Defendant the importance of telling the truth to keep himself out of trouble, but this only constitutes general encouragement to cooperate, not a more coercive tactic. *See United States v. Mashburn*, 406 F.3d 303, 310 (4th Cir. 2005) (noting that the discussion of cooperation or leniency does not produce a coercive environment). The

32

officers were not speaking over Defendant during the interview and Defendant's contact was limited to Detective Spencer and Officer Peralta with Defendant aware that Officer Peralta was present to serve as a translator. Therefore, the fact that two officers were present in the room with Defendant is not compelling to show a police dominated environment. Although both officers were armed, neither displayed their weapons to Defendant. Defendant continually had possession of his cell phone during this time and, even though the officers requested that he not answer an incoming call during questioning, his phone was not taken away and the officers did not threaten him. Defendant contends that he was in custody because he did not leave the interview room, but this does not evidence custody. The interview was fairly brief – only 52 minutes – and when this segment of questioning concluded, the officers exited the interview leaving the door open to the hallway or adjacent area. Defendant used his cell phone during the break on two separate occasions. Viewed objectively, the evidence indicates that a reasonable man in Defendant's position would not have believed he was "in custody" at any point during the interview and therefore was not entitled to be appraised of his *Miranda* rights.

The second interrogation began when Detective Spencer and Officer Peralta re-entered the interview room after approximately 20 minutes of break. Nothing physically changed during this segment of questioning except for the voice tone and demands of the officers to Defendant during their questioning. The officers became firmer in their questioning and began to introduce threats to Defendant about the charges he could face if he did not tell the "truth." After admonishing Defendant for approximately 10 minutes to tell the "truth," Officer Peralta *Mirandized* Defendant in Spanish. Gov't Ex. 6 at 2:55:01-2:55:51. Assuming Defendant was in custody at this point, once the officers began questioning Defendant a second time, Defendant did not provide any confession or incriminating statement until after he was in fact *Mirandized*.

33

In closing argument, Defendant compared the circumstances to a situation where officers deliberately gave *Miranda* warnings mid-interrogation, after incriminating statements were made, and provoked the defendant to repeat the incriminating statements after being *Mirandized*. *See Missouri v. Seibert*, 542 U.S. 600, 604 (2004) (holding that post-warning statements in such scenarios are inadmissable). Here, during the second segment of interrogation, officers administered Defendant his *Miranda* rights in his native language approximately 10 minutes after the conversation began. Even though Defendant was not *Mirandized* at the outset following the break in questioning, the court does not find this delay similar to the circumstances described in *Seibert*. There is no indication that the officers deliberately delayed giving a warning or gave the warning deceptively. Rather, the *Miranda* warning was given out of an abundance of caution and in Defendant's native language. Again, assuming Defendant was in custody and entitled to a *Miranda* warning, the court finds no violation occurred in the administering of the *Miranda* warning during the second segment of questioning at the Sheriff's Office.

As to Defendant's argument that his *Miranda* waiver was not knowing and voluntary, the court finds no evidence of misconduct by Detective Spencer or Officer Peralta that could support a conclusion that Defendant's waiver was involuntary. Defendant made no admissions to culpability prior to being *Mirandized* and was not subject to any physical coercion at the relevant time. Further, the totality of the circumstances indicate that Defendant's waiver was knowing and intelligent. There is no evidence that Defendant possessed a below-average intelligence or suffered from any mental disabilities. Moreover, Officer Peralta *Mirandized* Defendant in his native language to make sure was fully aware of and understood his rights. That the Defendant was a non-English speaker "does not necessarily thwart an effective waiver" of those rights,

34

particularly since Defendant had the *Miranda* warning recited to him in Spanish. *See United States v. Guay*, 108 F.3d 545, 549 (4th Cir. 1997). Further, the evidence does not indicate that Defendant failed to understand the rights as they were recited. Officer Peralta testified at the hearing that following the reading of the *Miranda* warning, Defendant said he wanted to tell his version of the events that occurred the evening before. Tr. 203. Further, Officer Peralta testified that Defendant never stated he did not want to speak with the officers or that he wanted to speak with a lawyer. *Id.* Next, Defendant signed a *Miranda* waiver form handed to him by Detective Spencer. Gov't Ex. 7. The text of the waiver form was in English, however, this form was given to Defendant immediately after being read his *Miranda* rights in Spanish and at no point did Defendant claim he did not understand the rights recited. Gov't Ex. 6 at 2:55:51-2:56:16. Based on the totality of the circumstances, Defendant's waiver was knowing and voluntary.

Accordingly, and for the foregoing reasons, the court recommends that Defendant's motion to suppress be denied as to Defendant's statements at the Sheriff's Office.

## CONCLUSION

For the reasons set forth above, it is RECOMMENDED that Defendant's Motion to Suppress be DENIED.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and Recommendation. Additionally, except upon grounds of plain error, failure to timely file written objections shall bar a party from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

SUBMITTED, this 25th day of October 2013.

Robert B. Jones, Jr.
United States Magistrate Judge