IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:13-CR-61-FL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| JOSE JUAN ALVAREZ-HERRERA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter comes before the court on defendant's motion to suppress (DE 45). Pursuant to 28 U.S.C. § 636(b)(1), United States Magistrate Judge Robert B. Jones, Jr. issued memorandum and recommendation ("M&R") wherein he recommends that the court deny defendant's motion. (DE 84). Defendant timely filed objections to the M&R (DE 86), and the government did not respond. In this posture, issues raised are ripe for ruling. For the following reasons, the court ADOPTS the findings and recommendations of the magistrate judge in large part and DENIES defendant's motion to suppress.

## BACKGROUND

Defendant was indicted on March 12, 2013 with being an illegal alien in possession of a firearm and ammunition, and aiding and abetting, in violation of 18 U.S.C. §§ 2, 922(g)(5)(a), and 924; being an illegal alien in possession of ammunition, and aiding and abetting, in violation of 18 U.S.C. §§ 2, 922(g)(5)(a), and 924; and illegally eluding examination or inspection by immigration officers in violation of 8 U.S.C. § 1325(a). (DE 1). On July 1, 2013, defendant filed the instant motion, seeking to suppress all evidence resulting from an October 14, 2012, search of defendant's

residence at 52 O&H Lane, Spring Lake, North Carolina, and to suppress statements made by defendant on that date.

The magistrate judge conducted an evidentiary hearing on August 28, 2013. (DE 79). At hearing the government presented the testimony of Detective Rodney Jackson ("Jackson"), Detective Spencer Elmore ("Elmore"), Officer Matthew Perez ("Perez"), Sergeant John Knight ("Knight"), and Officer Jose Peralta ("Peralta"), all employed at the Harnett County Sheriff's Office. The government also submitted exhibits including photographs, video and audio recordings depicting the scene of events, as well as a search warrant, a law enforcement supplement reflecting Jackson's notes, a consent to search form, and a Miranda waiver form. Defendant did not testify, but submitted the same consent to search form and a black-and-white photograph depicting the inside of a van.

Except where defendant has filed specific objection, the court adopts and incorporates herein the statement of facts contained in the M&R. Briefly, this case began when law enforcement retrieved a young Hispanic female victim of rape and shooting from the Cape Fear River. The victim identified Jose Sanchez ("Sanchez") as her assailant. Later that day, the victim's mother, Yolanda Vera Rosas ("Yolanda"), filed a missing persons report for her daughter from a residence on Parkway Lane in Harnett County. Perez, Elmore, Knight, and another detective responded to the report, meeting at the residence with Yolanda and the victim's sister, Liliana Vera Rosas ("Liliana").

Perez acted as a Spanish interpreter for the two women. Liliana told the officers that she lived with Sanchez and another individual – later identified as defendant – at a residence in O&H Lane in Harnett County. Knight asked Liliana for consent to search the residence and obtained her signature on a "consent to search" form authorizing all Harnett County deputies to conduct a search.

2

However, the portion of the form listing the address or location for search was left blank. Knight also asked for a key to the residence at O&H Lane. Liliana walked to a van parked outside the Parkway Lane residence to a van she had driven, and retrieved the key. When a law enforcement officer asked Liliana if she saw anything unusual inside the van, she pulled out a t-shirt. The van was then sealed until law enforcement obtained a search warrant.

Knight, Perez and Elmore then traveled to O&H Lane, finding Sanchez and defendant. Perez acted as translator again. After the two suspects came outside, the officers entered the residence and performed a cursory safety sweep. Jackson then arrived to question the suspects. After speaking to them, Jackson obtained consent to search the residence, finding a t-shirt emanating a smell of bleach, unspent caliber shell casings in the bottom of the toilet, and a box of ammunition. Jackson then directed all officers to leave and provided a probable cause statement to obtain a warrant for the residence.

Jackson asked the men if they would be willing to give a formal statement at the sheriff's office. The men agreed, but said they lacked transportation. Sanchez and defendant then rode in separate patrol cars to the sheriff's office, sitting in front without handcuffs or any other restraint. Defendant was placed alone in an interview room. After waiting alone for a period of time, defendant was interviewed by Peralta and another detective, with the last name of Spencer.[1] Peralta provided translation. The interview continued for approximately 50 minutes, until the officers left to take a break. Defendant remained alone in the interview room for 20 minutes, during which time he answered two cell phone calls. Spencer and Peralta returned to the room and interviewed defendant for approximately 15 minutes, then Peralta read defendant his <u>Miranda</u> rights in Spanish.

_____

[1]The record does not disclose Spencer's first name.

Defendant signed a waiver and continued speaking with officers for approximately one more hour. Finally, defendant was charged and arrested in connection with the incident.

## COURT'S DISCUSSION

A.      Standard of Review

The district court reviews *de novo* those portions of a magistrate judge's M&R to which specific objections are filed.  28 U.S.C. § 636(b).  The court does not perform a *de novo* review where a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982).  Absent a specific and timely filed objection, the court reviews only for "clear error," and need not give any explanation for adopting the M&R.  Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d 198, 200 (4th Cir.1983). Upon careful review of the record, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(c).

B.      Analysis

        1.      Objections to Statement of Facts

                a.      Perez's Translation

The M&R states that Perez acted as a translator for the police to speak to Spanish-speaking witnesses at defendant's home.  Defendant objects to the court's finding that Perez's translation was sufficient, arguing that fluency does not make one an adequate translator, and noting that the case marked Perez's first interview on patrol.  Defendant also argues that testimony conflicted as to whether Perez acted solely as a translator or if he also acted as the "lead" in confronting defendant at his residence.

4

Defendant has not provided any persuasive reason to doubt the accuracy of Perez's translation. The mere fact that Perez was performing his first interview on patrol does not render his translation insufficient or inaccurate. At hearing, counsel questioned the voluntariness of the defendant's consent to search by noting that Spanish and English were "being spoken above one another," (DE 79, at 223-224), but failed to provide any evidence that defendant misunderstood the Spanish being spoken. Furthermore, regardless of whether Perez acted as "lead," the testimony consistently showed that he was the primary officer responsible for translating to defendant and other Spanish-speaking witnesses. The exact nature of his role as a "lead" or mere translator is not relevant to the question of whether his interpretation was adequate.

   b.   Search of Defendant's Residence

Defendant objects to the M&R's omission of testimony by Elmore, Perez and Knight in its summary of facts. This testimony established that the police initially went to the wrong residence when they were following Liliana's directions to locate Sanchez. (E.g., DE 79, p. 117). Defendant argues that this mistake establishes that Liliana's consent to search was invalid, because it shows she was not a resident of 52 O&H Lane and therefore lacked authority to consent to a search. The court grants that the record shows that police initially arrived at the wrong residence. As discussed below, however, this added fact does not affect the legal conclusion regarding the validity of Liliana's consent to search.

Defendant also objects to the M&R's finding regarding Liliana's consent to search, arguing the M&R wrongly found that "Knight testified that Liliana gave him permission to enter into the house if they were unable to locate Jose and Juan." (DE 86 at 3, citing DE 84 at 4). The M&R merely states that "Liliana provided verbal consent and signed a 'Consent to Search' form

5

authorizing Sergeant Knight, Detective West, and all Harnett County deputies to conduct a search of the premises at the O&H residence." (DE 84 at 4). This statement is fully consistent with the testimony and exhibit on record. (DE 79, pp. 92-93; 153-157; Government Exh. 1). The court overrules defendant's objection in this instance.

   c. Identification of a Shell Casing Inside Van

Defendant challenges the court's finding that Knight could have seen a shell casing on the floorboard of the van within the brief time that he testified to looking inside. (DE 86, p. 3). As explained below, however, even if the court does not credit Knight's statements about spotting the shell casing, that fact does not impact the ultimate determination that officers lawfully searched the van. For the reasons explained below, the court finds that the search of the van was valid on other grounds.

  2. Objections to Recommendations

   a. Search of the Van at Parkway Lane

Defendant challenges the search of the van on two grounds. First, as noted above, he argues that Knight could not have seen the shell casing unless he had searched the van himself, without consent. In support of this argument, defendant notes Perez's testimony that Liliana and Yolanda (mother of Liliana and the victim) remained inside the Parkway residence with him, while Knight went outside to the van. Defendant implies that Knight must have conducted an invalid search, then fabricated the story regarding Liliana's consent.

Defendant also objects that in asking Liliana whether she had seen "anything unusual" in the van, the law enforcement officers illegally recruited a private individual to conduct a search violating the Fourth Amendment. (Id.).

Upon *de novo* review of the record, the court agrees with the magistrate judge's finding that Knight gave credible testimony concerning Liliana's entrance to the van. Both Knight and Elmore testified that Liliana went to the van to get her key. (DE 79, pp. 93, 156-157). Perez's testimony, meanwhile, was far more doubtful, allowing that he "may be mistaken" and that he might lack recollection because he "translated a lot that day." (Id., pp. 116-117). Having established that Liliana was at the van, the court further finds that her search of the van was valid.

The Fourth Amendment extends its protection over acts of private individuals who act as "instruments or agents" of the government. United States v. Jarrett, 338 F.3d 339, 344 (4th Cir. 2003). The Fourth Circuit has adopted two factors to consider in whether a search conducted by a private actor triggers the Fourth Amendment: (1) whether the government knew of and acquiesced in the private search; and (2) whether the private individual intended to assist law enforcement or had some other independent motivation. Id. To show the first factor, the Fourth Circuit requires evidence of something beyond "mere knowledge and passive acquiescence." Id. at 345.

In this case, the government's actions did not go beyond "mere knowledge and passive acquiescence" of Liliana's conduct. Liliana entered the van of her own accord. After she had already entered, law enforcement officers asked her whether she "saw anything unusual." (DE 79, p. 178). This question did not amount to active encouragement of Liliana to continue searching, as defendant contends. Police did not ask her to go back into the van. They did not direct her to retrieve any items. Liliana acted voluntarily.

Furthermore, Liliana's search of the van also falls within the "consent" exception to the Fourth Amendment. Schneckloth v. Bustamonte, 412 U.S. 218 (1973). Under this exception, law enforcement has the authority to conduct warrantless searches if "permission to search was obtained

7

from a third party who possessed common authority over or other sufficient relationship to the...effects sought to be inspected." United States v. Matlock, 415 U.S. 164 (1974). "Common authority" in the context of third-party consent "is not merely a question of property interest. Rather it requires evidence of 'mutual use' by one generally having 'joint access or control for most purposes.'" United States v. Buckner, 473 F.3d 551, 554 (4th Cir. 2007)(quoting Matlock, 415 U.S. at 171, n. 7). Even without proof of actual authority, apparent authority to consent to a search is sufficient. Id. at 555. "As long as the facts available to the officer at the moment . . . warrant a person of reasonable caution in the belief that the consenting party had authority, apparent authority to consent exists, and evidence seized or searched pursuant to that consent need not be suppressed." Id. (internal punctuation omitted). A party with "sole possession and control of a vehicle clearly has the authority to consent to its search," for "[b]y relinquishing possession to another, the owner or lessee of the vehicle evidences an abandonment of his or her privacy interest in the vehicle." United States v. Doreste, 1991 U.S. App. LEXIS 26163, 6 (4th Cir. Nov. 4, 1991)

The record in this case supports that Liliana had common authority over the van to allow a search. Liliana drove the van to the Parkway residence. (DE 79, p. 111, 113). Knight also testified that Liliana referred to the van as "hers." (Id., p. 156). Liliana knew that a key to the O&H residence was inside the van, which indicated that she had a general knowledge of the van's contents. (Id., at p. 157). She also had full access to the van. Thus, the facts available to the officers at the scene warranted a person of reasonable caution to believe that Liliana could have consented to a law enforcement search of the van – a fact which also establishes that she had full authority to search herself.

While law enforcement obtained a search warrant following Liliana's search, this

demonstrated an act of extra caution, and did not undermine the consent officers had already obtained. Given that the van was covered in mud (DE 79, p. 93), that Liliana told the officers about Sanchez's use of the van (Id., p. 111-112), and that Liliana retrieved a bloodstained shirt from inside (Id., p. 113), the officers' had probable cause to obtain a search warrant, even if Knight had not seen the shell inside. This search warrant, in turn, would have obtained the shell and all other items of evidence found in the van even if Knight or Elmore had not seen the shell while standing outside it. See United States v. Allen, 631 F.3d 164, 172 (4th Cir. 2011)(Detective's inaccurate statements that firearm was in "plain view" were unnecessary to probable cause determination, as other information established probable cause).

b.      Search of the O&H Residence

Defendant objects to the M&R's recommendations to deny the suppression of evidence obtained through the two searches of defendant's residence at 52 O&H Lane: one brief initial search, and the second search conducted by Jackson with consent.

i.      Initial Search

Defendant argues that Liliana had no standing to provide consent to search the home, noting that she did not give the officers the right address or description and arguing that the officers lacked a reasonable basis to believe she had authority to consent. (DE 86, p. 5). This issue invokes the same principles of "apparent authority" to consent to search noted above.

Applying those principles, a person of reasonable caution would have believed that Liliana had authority to consent to a search of the O&H residence. Her description of the premises, although not entirely accurate, was sufficiently detailed to be credible. Liliana told the officers that she lived at that location with her boyfriend and defendant–a fact that would seem unlikely for her

to fabricate. (DE 79, p. 112). She was able to provide a general description of the trailer and its location. (Id., p. 117). As noted above, Liliana's inability to remember an exact address was understandable, given that she told police she had only recently moved to the residence. (Id., p. 112). In addition, Liliana possessed a key to the residence, a clear indicia of authority to consent. (Id., p. 157). Liliana had at least apparent authority to consent, if not actual authority.

Defendant also objects to the M&R's findings that Liliana's consent authorized the initial sweep the officers made through the residence.[2] First, defendant argues that Liliana's consent to search the residence was conditional. In support, defendant notes Elmore's testimony that Liliana's consent allowed the police "to go to the residence if we were unable to get anybody to the door, if we could have her consent to go inside the residence...She went to go get her keys to her residence so if nobody came to the door that we could go in." (DE 79, p. 93). Defendant also notes that the consent to search form did not include any description of the property or items that law enforcement would search. (Gov. Exh. 1, Def. Exh. 1).

In determining the scope of a consent search, the relevant question is "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Florida v. Jimeno, 500 U.S. 248, 251 (1991). The scope of a consent search is not limited only to those areas or items for which specific verbal permission is granted, but may be supplied by non-verbal conduct. United States v. Neely, 564 F.3d 346, 350 (4th Cir. 2009).

The record supports the magistrate judge's finding that Liliana provided consent to search the residence. Defendant's attempt to characterize the search as "conditional" by focusing on

_____

[2]While the deputies referred to this as a "safety sweep," the parties did not brief the issue of whether the initial search was valid as a protective sweep, and the magistrate judge found that the law governing protective sweeps appeared inapplicable. (DE 84, p. 21, n. 27).

10

Elmore's use of the word "if" is misguided. As the M&R notes, Elmore was not responding to a question about the scope of Liliana's consent. (DE 84, pp. 23-24). Furthermore, it was Knight, not Elmore, who asked for Liliana's consent. Knight testified that he asked Liliana to sign the consent form "for us to go inside the residence," and that he told Liliana that he needed "some kind of writing...that gives me access to that residence." (DE 79 at pp. 153, 157). Nothing suggested that his request was in any way conditional.

Nor did the consent to search form set any conditions on the search. (Gov. Exh. 1, Def. Exh. 1). Liliana did not write any notations restricting the search, she simply provided her signature. Furthermore, the court finds this consent form sufficient to authorize the search. The absence of an address is consistent with the testimony of both Perez and Elmore, who stated that Liliana had recently moved to the O&H residence, was unsure of her exact address, and could only provide a description of the residence. (DE 79 at pp. 95-96, 112, 117). Knight also explained that he was eager to get to the residence because Liliana had testified that the suspects were "preparing to leave to go back to Mexico." (Id. at p. 158). Under these circumstances, it is credible that Knight may have committed a "human error" and forgotten to complete the form after the deputies determined the exact address. (Id. at 156-158). Knight's and Elmore's testimonies consistently maintained that the consent to search form referred to defendant's O&H residence. (Id. at pp. 93, 157).[3] Finally, Liliana handed the officers her key to the residence, clearly demonstrating an unqualified consent. (Id. at p. 157). All of these circumstances together show that Liliana consented to a search of the

---

[3] The court notes that Perez's testimony apparently contradicts that of Knight and Elmore in stating that the consent authorized a search of the vehicle rather than the residence. (DE 79, p. 116). However, Perez also testified that his recollection "may be mistaken." (Id.). In light of his own uncertainty, the court finds the testimony of Knight and Elmore more credible.

11

residence that was not limited to merely locating the defendant and Sanchez.

In light of all these considerations, the court adopts the magistrate judge's recommendation to deny suppression of evidence regarding the deputies' initial search.

### ii.     Jackson's Search

Defendant also objects to the second search performed on the residence, conducted by Jackson following the initial sweep. (DE 86, p. 5). Again, the search was valid under Liliana's earlier consent. Even if Liliana had not consented, both defendant and Sanchez voluntarily provided consent to search.

Courts consider whether consent is voluntarily given under a "totality of the circumstances" standard. United States v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996). The court agrees with the magistrate judge's analysis regarding the voluntary nature of the consent provided. Perez translated the communications, and the suspects were informed that they were not under arrest and had the freedom to leave. (DE 79, p. 125). The officers reholstered their guns after the two suspects initially exited the residence. (Id., pp. 98-99). The suspects could freely move about the residence. (Id., pp. 79, 125). All of these circumstances establish the voluntary nature of the consent provided.

Jackson's testimony stated that both suspects provided consent. (Id., p. 31). Defendant challenges these findings by noting a discrepancy between the testimony of Perez and Sanchez. (DE 86, p. 5). Jackson testified that he obtained permission to search from both suspects after opening the front door, while Sanchez and defendant sat on the couch. (DE 79, pp. 29-31). Defendant contends that Perez contradicted this testimony when he stated that Sanchez consented to the search while speaking to deputies on the porch outside the residence. (Id., p. 137). Yet defendant exaggerates this contradiction and its importance. First, Perez's testimony was unclear about the

12

exact location where Sanchez provided consent. Indeed, Perez later stated that "We had walked into the residence and walked back out after they got consent." (Id., p. 138). Perez also admitted several times that he had difficulty recollecting specifics of that day. (E.g., DE pp. 79, 116). The court finds Jackson's testimony more credible, establishing that defendant provided consent.

Even if only Sanchez provided consent, that consent would have been valid because Sanchez had "common authority" to consent to the search. Matlock, 415 U.S. 164 at 171. While defendant argues that he himself never consented, he provides no evidence of refusing permission. Without the defendant clearly expressing his refusal, the officers could not be expected to know that he objected to the search. See Georgia v. Randolph, 547 U.S. 103, 120 (2006)("[A] warrantless search of a shared dwelling for evidence over *the express refusal* of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident")(*emphasis added*); United States v. Shrader, 675 F.3d 300, 306 (4th Cir. 2012)("The Supreme Court made clear that to defeat a cotenant's consent, the defendant must be *both* 'present and objecting.'")(*emphasis added*).

Finally, defendant assails this second search on the grounds that Jackson subsequently sought a search warrant. In doing so, however, Jackson merely exercised extra caution. Law enforcement should not be penalized for going beyond the procedural safeguards required by law.

Accordingly, the court adopts the M&R's recommendation to deny defendant's motion to suppress Jackson's warrantless search.

      c.    Defendant's Statements

Defendant seeks to suppress all statements provided by defendant, both at the O&H residence and at the sheriff's office. With respect to the questioning at the sheriff's office,

defendant's motion focused on the <u>Miranda</u> waiver he signed, arguing that it was insufficient because it was written in English. (DE 45, p. 6). At the hearing, defendant argued that the <u>Miranda</u> warning was also inadequate because it was introduced only "at the cusp of [defendant] making certain incriminating evidence," in violation of the Supreme Court's decision in <u>Missouri v. Seibert</u>. 542 U.S. 600 (2004). (DE 79, p. 224-225). The M&R recommended that the court deny suppression of statements provided in both locations. On objection, defendant only challenges statements provided at the sheriff's office. Because the court agrees with the magistrate judge's recommendation regarding the statements made at the O&H residence, and as defendant has not specifically objected to his recommendation on these statements, the court hereby adopts the magistrate judge's recommendation to deny suppression of these statements. The statements defendant offered inside the sheriff's office remain at issue.

Law enforcement must provide <u>Miranda</u> warnings when a subject is interrogated while in custody. <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). To determine whether an individual is "in custody," the court considers whether, under the totality of circumstances, the suspect's freedom of action "is curtailed to a degree associated with formal arrest." <u>Berkemer v. McCarty</u>, 468 U.S. 420, 440 (1984). The key question is "how a reasonable man in the suspect's position would have understood his position." <u>Id.</u> at 422.

Relevant factors in the determination of custody include the duration of the questioning, statements made during the interview, the presence of physical restraints, and whether officers release the interviewee at the end of the questioning. <u>Howes v. Fields</u>, 132 S. Ct. 1181, 1189 (2012). Informing a suspect that he is not under arrest may show a lack of custody, but is not dispositive. <u>Compare</u> <u>United States v. Hargrove</u>, 625 F.3d 170, 178-182 (4th Cir. 2010)(suspect not "in custody"

when he was told that he was not under arrest and free to leave, interviewed at home, without handcuffs or drawn weapons, given freedom of movement, and conversation was conducted in "amicable" tone), with United States v. Colonna, 511 F.3d 431, 435 (4th Cir. 2007)(despite being instructed that he was not under arrest, suspect was "in custody" when he was awakened at gun point at home, guarded at all times, interviewed for three hours, and never told that he was free to leave or did not have to respond to questions). Another nondispositive factor concerns whether the police interview the suspect at a law enforcement facility. This fact does not by itself establish custody, so long as the individual perceives that his freedom of movement was not constrained to a degree associated with the arrest. United States v. Howard, 115 F.3d 1151, 1155 (4th Cir. 1997).

The magistrate judge appropriately considered defendant's interrogation in two segments – questioning before and after the 20 minute break. Before the break, defendant spoke freely with officers at the O&H residence, without police significantly limiting his movement and under the assurance that he was not under arrest and had freedom to leave. (DE 179, pp. 125-127). While defendant was transported to the sheriff's department in a patrol car, he went voluntarily and sat in the front of the car, without any restraints. (DE 79, p. 35). He was given water while waiting in the interview room prior to questioning. (Gov. Exh. 6). The interview began with Spencer reminding defendant, through Peralta's translation, that he was not under arrest. (Gov. Exh. 6, 51:08-51:24). The conversation tone was amicable. Only two officers were present, the interviewer (Spencer) and translator (Peralta). The officers did not display weapons. The interview lasted only 52 minutes, which was a reasonable amount of time – especially given that questions and answers had to be relayed in translation. None of this would give a reasonable impression of constrained movement. (Gov. Exh. 6, 50:50-103:00).

Defendant argues that the content of the interrogation – which consisted of general questions about his living arrangements and whereabouts – was "directly related to the investigation." (DE 86, p. 6). Yet even if the purpose of an interview is to investigate a crime, the interview does not necessarily become "custodial" unless the individual "has been taken into custody or otherwise deprived of his freedom of action in any significant way." Beckwith v. United States, 425 U.S. 341, 347 (1975)(rejecting defendant's argument that Miranda applies in non-custodial circumstances after an investigation has focused on a subject); United States v. Griffin, 922 F.2d 1343, 1348 (8th Cir. 1990)("It is insufficient to render an interrogation custodial that the purpose of the interrogation is to obtain potentially inculpatory information from a suspect that has become the focus of the investigation."). The fact that the questioning had some relationship to the investigation was outweighed by other circumstances preserving the defendant's liberty.

In the second segment of interrogation, the atmosphere changed considerably. During the break, Spencer had learned that the victim in the investigation implicated defendant and Sanchez in the crime. (DE 79, p. 198). Spencer returned to the interview room with a much more insistent and forceful tone, pointing her finger and pen at defendant and threatening him with charges he would face if he did not tell "the truth." Defendant repeatedly responded by asking what the police would do for him in return for information. This line of questioning continued approximately fifteen minutes, culminating with Spencer telling defendant she would arrest him if he did not tell "the truth," and then instructing Peralta to translate the Miranda warning. (Gov. Exh. 6, 124:00-140:00).

The change in tone did not make the interrogation custodial. Indeed, prior to being read his Miranda warning, defendant actually asked whether he was going to be arrested, clearly showing that he did not believe himself in custody. (Gov. Exh. 6, 132:50-133:00). Aside from the more

16

insistent tone, no other conditions about the interview changed from those in the previous non-custodial interrogation.  The mere fact that Spencer admonished defendant to tell the truth or face consequences did not render the exchange custodial.  United States v. Braxton, 112 F.3d 777 (4th Cir. 1997)(trooper's remark to defendant that "you're not coming clean" and threat of jail time did not make confession involuntary).

The Supreme Court's decision in Missouri v. Seibert does not apply.  There, the Court addressed a two-step, "question-first" police strategy in which officers intentionally withheld Miranda warnings, questioned the suspect until securing a confession, then obtained a Miranda waiver and asked the suspect to repeat his confession.  Seibert, 542 U.S. at 604.  The "underlying assumption" to this method of interrogation, the Court noted, was that "with one confession in hand before the warnings, the interrogator can count on getting its duplicate."  Id. at 613.  Inserting Miranda rights "in the midst of coordinated and continuing interrogation" would likely "mislead and deprive a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them."  Id. at 613-614.  The Court listed relevant facts bearing on whether a midstream Miranda warning was effective, including the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the two statements, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.  Id. at 615-616.  Because the decision was a plurality, the Fourth Circuit also follows Justice Kennedy's concurring opinion, which only applies Seibert when "the deliberate 'question-first' strategy is employed."  United States v. Mashburn, 406 F.3d 303, 309 (4th Cir. 2005).

In this case, there is no evidence that law enforcement deliberately employed a "question-

first" strategy in an attempt to obtain defendant's confessional statements. Furthermore, the <u>Seibert</u> factors counsel weigh towards admitting the post-<u>Miranda</u> evidence. While the timing, setting, and personnel remained the same, and while police treated the two rounds as continuous, the details and content of the two statements were entirely different. Defendant significantly changed his story after he received the <u>Miranda</u> warning. Nor did the police treat the pre- and post-<u>Miranda</u> warning interrogations as a continuous interaction. Unlike in <u>Seibert</u>, defendant's earlier statements were not used to obtain an admissible duplicate statement–on the contrary, in repeatedly emphasizing the need for "truth," the officers anticipated that defendant's statements would change.

Finally, the court notes that defendant appears to have accepted the magistrate judge's ruling regarding his "knowing and voluntary" waiver of his <u>Miranda</u> rights, given that the objections did not discuss the waiver form. The court agrees with the magistrate judge's analysis of this question, and finds that defendant's waiver was knowing and voluntary.

Accordingly, the court adopts the magistrate judge's recommendation to deny suppression of the statements provided at the sheriff's office.

## CONCLUSION

Upon *de novo* review of those portions of the magistrate judge's M&R to which specific objections have been filed, and upon considered review of those portions of the M&R to which no such objection has been made, the court overrules defendants' objections, and ADOPTS the findings and recommendations of the magistrate judge. Accordingly, defendant's motion to suppress (DE 45) is DENIED.

SO ORDERED, this 12th day of December, 2013.

_____
LOUISE W. FLANAGAN
United States District Judge